IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

VICTOR VARGO and CARIJEAN BUHK,
individually and on behalf of a class of all others
similarly situated,

                          Plaintiffs,                          OPINION and ORDER

    v.                                                          20-cv-1109-jdp

DAVID CASEY, Wisconsin Secretary
of Revenue,

                          Defendant.[1]

---

      This is a class action lawsuit challenging provisions of Wisconsin's Revised Unclaimed

Property Act (UPA) under the takings clauses of the United States and Wisconsin

constitutions. Under the UPA, Wisconsin takes custody of lost or abandoned property,

converts it to cash if necessary, and returns the money if the owner claims it, which a property

owner may do at any time. In the meantime, Wisconsin derives investment income from the

UPA funds, which it uses to fund public school libraries. For property valued at more than

$100, Wisconsin's UPA directs the Secretary of the Department of Revenue to pay interest,

using a federal rate set by the Internal Revenue Service. The Secretary cannot pay any interest

for periods before January 2, 2019.

      Plaintiffs are owners of unclaimed property in the Secretary's custody under the UPA.

Their property was not earning interest before the state took custody. Plaintiffs contend that

the UPA's interest-payment provisions violate the Takings Clause by denying them earnings

---

[1] The court has changed the caption to reflect that the Secretary of the Wisconsin Department
of Revenue is now David Casey, who was named on April 29, 2024. Fed. R. Civ P. 25(d).

on their unclaimed property, which they allege is likely to be more than the federal rate prescribed by the statute. Their claim is founded on a series of cases from the Court of Appeals for the Seventh Circuit, which held that a state violates the Fifth Amendment if it fails to repay the owner the state-earned interest on her reclaimed property, even if that property had not been earning interest prior to state custody. *See Goldberg v. Frerichs*, 912 F.3d 1009, 1012 (7th Cir. 2019); *Kolton v. Frerichs*, 869 F.3d 532, 533 (7th Cir. 2017); *Cerajeski v. Zoeller*, 735 F.3d 577, 578 (7th Cir. 2013). Plaintiffs are proceeding on class-wide claims for prospective declaratory and injunctive relief.

The case is before the court on cross-motions for summary judgment. Plaintiffs say the case is simple: the Seventh Circuit has said that when settling a claim for the return of unclaimed property, the state must pay the claimant the interest the state earned on the property while it was in the state's custody, but Wisconsin does not do this. They say this entitles them to a declaration that, by enforcing Wisconsin's UPA as written, the Secretary of the Department of Revenue is violating the Takings Clause of the Fifth Amendment. Dkt. 68.

The Secretary doesn't dispute that the statute works the way plaintiffs say it does, nor does he reconcile the January 2019 cutoff or the use of a federal rate instead of the state's actual rate of return with the rule announced in *Cerajeski, Kolton*, and *Goldberg*. Instead, the Secretary argues that this court should not even hear plaintiffs' claims, either because they are barred by sovereign immunity or because plaintiffs' alleged risk of under-compensation is too speculative to satisfy the "case or controversy" requirement of Article III. Alternatively, the Secretary argues that plaintiffs have no right to repayment of *any* interest, either because their property was abandoned or because it was not earning interest before the Department took custody of it.

The court agrees with the Secretary that plaintiffs' state-law claim is barred by sovereign immunity. But the Secretary's arguments in opposition to plaintiffs' federal takings claim have already been rejected by this court or the Seventh Circuit. So the court will deny the Secretary's motion on plaintiffs' federal claim. Further, because there is no dispute that Wisconsin's UPA fails to guarantee that a property owner will receive at least the state-earned interest when she reclaims her property, the court will grant plaintiffs' motion on their federal takings claim. The court will defer ordering any relief until plaintiffs clarify what they are asking the court to declare or enjoin, and the Secretary has had an opportunity to respond to plaintiffs' proposal.

BACKGROUND

A. Factual background

Wisconsin has an unclaimed property law (UPA), Chapter 177 of the Wisconsin Statutes, that regulates what businesses are to do with unclaimed or abandoned financial assets, such as savings accounts, checking accounts, stocks and mutual funds, securities, and mature life insurance policies. In general, after one to five years of inactivity by the property owner, Wisconsin businesses must turn over all unclaimed property to the Department of Revenue, which is charged with administering the law. The Department takes custody of the property indefinitely and returns it to the owner if the owner claims it and can prove ownership or legal rights to the funds. If the property delivered to the Department is not in the form of money, such as tangible contents of safe deposit boxes or securities, the Department may first convert it to money by selling it.

The Department of Revenue does not keep a separate account for each of the thousands of unclaimed property owners whose funds are in state custody, nor does it keep all the

unclaimed property funds in one, self-contained account. Under the UPA, the Department is required to deposit unclaimed property funds in the Common School Fund, a trust fund created by the Wisconsin Constitution that is administered by the Board of Commissioner of Public Lands (BCPL). Wis. Stat. § 177.0801(1); Wis. Const. Art. X, § 5. But the Secretary must also keep a "general fund" containing amounts he reasonably estimates are needed to pay allowed claims and administrative expenses. Wis. Stat. § 177.0801(2).

Most of the UPA funds go into the Common School Fund, where they are pooled with other revenues and assets. Once in the Common School Fund, the BCPL uses the UPA funds in different ways, investing some under the reasonably prudent investor standard and loaning some to municipalities and school districts. In addition, some of the funds in the Common School Fund, along with those in the General Fund, are pooled and invested with the cash balances from various other funds into a single, State Investment Fund (SIF). Wis. Stat. §§ 25.14(1)(a); 25.17(1). The SIF is a "pool of cash balances of various state and local governmental units" and serves as the state's cash management fund, providing needed liquidity for operating expenses.[2] The BCPL generates investment income on the Common School Fund, which it distributes to benefit public school libraries in Wisconsin. *See* Wis. Stat. § 24.78; https://bcpl.wisconsin.gov/Pages/Home.aspx (visited Nov. 3, 2024).

Wisconsin's unclaimed property law is not an escheat statute; it is purely custodial. The state retains custody of the property, but title to the property remains with the owner. The Department of Revenue maintains an online database by which owners can search for

---

[2]https://www.swib.state.wi.us/state-investment-fund#:~:text=It%20includes%20retirement%20trust%20funds,needed%20liquidity%20for%20operating%20expenses.

unclaimed property. The owner may reclaim his or her property from the state at any time by filing a claim for the property with the Department. Wis. Stat. § 177.0903(1). The Department has 90 days in which to allow or deny the claim. Wis. Stat. § 177.0904(2). If the Department allows the claim, then it "shall pay or deliver the property to the owner or pay to the owner the net proceeds of a sale of the property, together with interest, income or gain to which the owner is entitled under s. 177.0607."

Wis. Stat. § 177.0607 is the subject of this suit. The relevant subsection, § 177.0607(2) states:

> Except as provided in subs. (3) and (4), when the administrator pays to a claimant property in the form of money . . . the administrator shall pay simple interest on that money for the period that it was in the custody of the administrator or this state at an annual rate equal to the applicable annual federal long-term rate determined under section 1274(d) of the Internal Revenue Code in effect on December 31 of the year prior to the year in which the claim is paid.

Subsection (3)(c) provides that, for property received by the administrator that was not interest-bearing to the owner, interest "shall not accrue" before January 2, 2019. (January 2, 2019 is the date of the Seventh Circuit's mandate in *Goldberg*.)

## B. Procedural history

Plaintiffs Victor Vargo and Carijean Buhk are owners of unclaimed property that is currently in state custody pursuant to the UPA. Buhk's unclaimed property consists of an outstanding check from Prudential Financial Inc. for $284.40, which was transferred to the state in December 2006.[3] Vargo's unclaimed property includes beneficiary funds from

---

[3] Buhk also has two or three items of unclaimed property valued at less than $100. Under Wisconsin's revised UPA, the state does not pay any interest on reclaimed property of $100 or less, but Buhk has withdrawn her challenge to that provision of the statute. *See* Dkt. 63, at 11; Dkt. 75 (Buhk Affidavit), ¶ 8 (identifying her $284.40 property as the "one property

Prudential Insurance Company for $6,939.69; it's unclear when the state obtained custody over Vargo's funds. Buhk has not yet asserted a claim for her property. Vargo asserted a claim in 2020 but has not provided the documents required by the Department to process and approve the claim. Neither Buhk nor Vargo's property earned interest prior to being in state custody.

Plaintiffs commenced this action in December 2020. Relying on *Cerajeski, Kolton*, and *Goldberg*, plaintiffs alleged that Wisconsin's unclaimed property statute violated the takings clauses of the United States and Wisconsin constitutions by denying owners the state-earned interest on their property when they filed a claim for its return.[4] At the time, Wisconsin did not compensate owners for interest that the property earned while in state custody if the property was not interest bearing before the state took custody. Plaintiffs sought damages for past claims in which the state denied this interest, as well as prospective claims for declaratory and injunctive relief.

The state legislature changed the law in 2021 Wis. Act 87. As set out above, under the revised law, the Department of Revenue now pays some interest on all reclaimed property valued at more than $100, even if the property did not bear interest before it was delivered by the holder to the state. Wis. Stat. § 177.0607(2). The Secretary moved to dismiss plaintiffs' claims for prospective relief as moot in light of the statutory changes. But the court was not

---

relevant to this motion"); Dkt. 87, at 4, n.3.

[4] The original complaint was filed by Vargo and Margaret Seibers. Dkt. 1. This court granted plaintiffs leave to amend their complaint and dismissed Seibers on July 5, 2022. Dkt. 41, at 20–21. With the court's permission, plaintiffs filed a third amended complaint on August 5, 2022, adding Buhk as a plaintiff. Dkt. 46.

persuaded that it was "absolutely clear" that alleged uncompensated takings would cease, so it denied the Secretary's motion. Dkt. 41, at 7–8.

The court also rejected the Secretary's arguments that the case should be dismissed as unripe or barred by sovereign immunity. As for ripeness, the court found that even though Vargo and Buhk had not yet filed a claim with the Department to reclaim their property, their injuries were not unduly hypothetical or speculative given that the statute "spelled out" the interest that the state would or would not pay. Dkt. 41, at 9. Specifically, the court noted that under the terms of the revised statute, Vargo and Buhk "are not entitled to interest on property valued at less than $100 or interest earned before January 2, 2019." *Id*. at 10. (Plaintiffs are no longer challenging the failure to pay interest on amounts under $100.)

As for sovereign immunity, the court agreed that plaintiffs could not sue the state for damages or for retrospective relief for already-settled claims. *Id*. at 14. But it held that plaintiffs could proceed under *Ex parte Young* on official-capacity claims against the secretary of the Department of Revenue on their forward-looking requests for declaratory and injunctive relief. The court concluded that plaintiffs' request for an injunction that prohibited the Secretary from refusing to pay all earned interest on plaintiffs' unclaimed property moving forward was prospective relief. *Id*.

The court later granted Buhk's motion for class certification and appointed her as representative for the following class:

> All persons or entities (including their heirs, assignees, legal representatives, guardians, administrators, and successors in interest) who have property in the form of money that is $100 or more in the State of Wisconsin's custody under the Wisconsin Revised Uniform Unclaimed Property Act that was non-interest bearing at the time it was delivered to the state, and whose claim is allowed under Wis. Stat. § 177.0904(2). The class does not include states and governmental units or subdivisions of states.

7

Dkt. 63.

In the class-certification order, the court revisited the topic of ripeness, concluding that plaintiffs had a ripe Fifth Amendment claim based on their allegation that the state had taken their interest and used it to fund public programs, regardless whether the state might later provide full compensation for that taking. Dkt. 63, at 8. The court's conclusion was based on *Knick v. Tnshp. of Scott, Pennsylvania*, 588 U.S. 180 (2019), in which the Supreme Court held that "because [a Takings Clause] violation is complete at the time of the taking, pursuit of a remedy in federal court need not await any subsequent state action." *Id.* at 202; *see also Cerajeski*, 735 F.3d at 580 ("Even if by some magic the cost to the state of its custodianship of Cerajeski's bank account and related services equaled the confiscated interest, the confiscation would be a taking within the meaning of the takings clause."). The court also concluded that plaintiffs' claims for equitable relief could be resolved on a class-wide basis, even though the state's method for calculating interest might not harm every member of the class. *Id.* at 15. The court noted that plaintiffs weren't asking the court to order the Secretary to make any specific calculations regarding interest amounts due any particular class member, but were challenging the constitutionality of the UPA's method of calculating pecuniary compensation, which applied to everyone in the class. *Id.*

The case is now before the court on cross-motions for summary judgment. Dkt. 64; Dkt. 68. The court evaluates the motions under the familiar summary judgment standards, which provide that summary judgment is appropriate when the record demonstrates that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 391–92 (7th Cir. 2011). The court construes the evidence,

and all inferences that reasonably can be drawn from the evidence, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The standard is the same on cross motions for summary judgment: the court evaluates each motion independently, viewing the evidence in favor of the non-moving party. *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 590 (7th Cir. 1991).

The court begins with the Secretary's standing and sovereign immunity arguments before turning to the merits.

ANALYSIS

**A.  Standing**

To satisfy Article III's "cases or controversies" requirement, a plaintiff suing in federal court must have suffered "(1) a concrete, particularized, and actual or imminent injury (an 'injury in fact') (2) that is fairly traceable to the "the Secretary" and (3) that is likely to be redressed by a favorable judicial decision." *Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The requirement that the plaintiff must have an injury that is actual or imminent closely relates to the doctrine of ripeness, which holds that a court should refrain from issuing injunctive or declaratory relief unless (or until) the legal action being challenged produces a real impact on the challenging parties. *See Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57-58 (1993). Both ripeness and standing "bar a plaintiff from asserting an injury that 'depend[s] on so many future events that a judicial opinion would be advice about remote contingencies.'" *Rock Energy Co-op. v. Vill. of Rockton*, 614 F.3d 745, 748 (7th Cir. 2010) (quoting *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 538 (7th Cir. 2006)).

The Secretary argues that plaintiffs' injuries in this case are too speculative for Article III purposes because plaintiffs "have taken no steps to obtain return of their property, and thus have no way to know if they will be injured at all[.]" Dkt. 65, at 41. As noted, this court has twice rejected this argument in previous orders. Dkt. 41, at 9–10; Dkt. 63, at 8. The Secretary suggests that this court erred in relying on *Knick* because *Knick* was a § 1983 case brought against a municipality, not a Fifth Amendment case asserted directly against a state like this one. Dkt. 65, at 42. But he doesn't explain why the Court's conclusion regarding when a takings claim accrues should be different when it's the state instead of a local government that took the property. The Secretary instead reverts to a discussion of sovereign immunity, *id.*, but that concept is distinct from ripeness.

Still, the sole question in *Knick* was whether the Court should reconsider *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), which held that property owners must seek just compensation under state law in state court before bringing a federal takings claim under § 1983. 588 U.S. at 177. *Knick* did nothing to alter the ordinary rules of standing, including the requirement that a plaintiff suing in federal court must demonstrate an injury that is actual or imminent. Under *Knick*, plaintiffs may have a cognizable *legal* injury at the time the Secretary takes their property, "[b]ut under Article III, an injury in law is not an injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021). "The Judiciary's role is limited 'to provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) (quoting *Lewis v. Casey*, 518 U.S. 343, 349 (1996)).

This means that it's not enough for plaintiffs simply to show that, as they put it, Wisconsin's UPA system is "misaligned with the Constitution." Dkt. 78, at 2. That alone would

be a legislative problem, not a judicial one. To satisfy Article III, they must show that, as a result of that so-called misalignment, they and the other class members face a "sufficiently imminent and substantial" risk of harm. *Ramirez*, 594 U.S. at 435 ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."). At summary judgment, plaintiffs bear the burden of coming forth with "specific facts" to establish standing. *Id*.

Plaintiffs have met their burden with respect to Wis. Stat. § 177.0607(3)(c). That provision prohibits the payment of *any* interest for periods before the Seventh Circuit issued its mandate in *Goldberg*. This means that anyone in the class who, like Buhk, has unclaimed property that was transferred to the state before January 2, 2019, will be denied interest for that time period. Although the degree to which these class members will be harmed varies based on how long their property was in state custody and the rate at the time they reclaim it, the likelihood of financial harm is imminent and substantial by virtue of the statutory language. So plaintiffs have standing to challenge the cut-off provision. The Secretary hasn't argued otherwise, nor has he offered any explanation for the January 2, 2019 cut-off date.

The court reaches the same conclusion with respect to the rate provision, Wis. Stat. § 177.0607(2). In the third amended complaint, plaintiffs allege generally that Wisconsin's revised UPA threatens to deny them just compensation because "[t]he interest and earnings and/or time value of money on state-held unclaimed property exceed amounts paid or to be paid to Plaintiffs and the proposed class." Dkt. 46, ¶ 25. As is plain from the amended complaint and plaintiffs' briefs on summary judgment, this allegation is based on the rates of return earned by the Common School Fund, where is where most of the unclaimed property

funds are deposited and invested. Plaintiffs allege that the Common School Fund "has earned high returns in recent years that well exceed the AFR which is used to calculate the interest paid to claimants pursuant to the new UPA." Dkt. 78, at 26–27. Plaintiffs support this allegation with the BCPL's biannual financial statements from 2017–2021, which they say show two years in which the School Fund's return on its "investment and interest income" outperformed the AFR. *See* Grzezinski Decl., Dkt. 81, Exhs. 6 and 7; *see also* Plt.'s Opp. Br., Dkt. 78, at n.12. Based on the court's own calculations (using plaintiffs' proposed formula of "investment and interest income" divided by the previous year's ending fund balance as reported on the Common School Fund Financial Statements, *see* Dkt. 78, n.2), the Common School Fund's rate of return has been greater than the federal AFR in 3 of the past 6 years:

| Year | Common Fund Rate[5] | Long Term AFR[6] |
|------|---------------------|------------------|
| 2018 | 2 % | 3.31% |
| 2019 | 5% | 2% |
| 2020 | 3% | 1.31% |
| 2021 | 12% | 1.91% |
| 2022 | -- (negative return) | 4.34% |
| 2023 | 2.7% | 5.03% |

In his responses to plaintiffs' proposed findings of fact, the Secretary dismisses evidence of the Common School Fund's earnings as "immaterial to any issue to be decided in this case." *See* Dkt. 86, Responses to PPFF Nos. 8 and 10. The court disagrees. Past wrongs are relevant to whether there is a real and immediate threat of repeated injury, if the plaintiff can show that the harms are substantially likely to be repeated. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Evidence showing that an unclaimed property owner who reclaimed her property in the past six years stood a 50 percent chance of under-compensation is sufficient to show that plaintiffs face a sufficiently imminent and substantial risk that they too will be under-compensated when they reclaim their property. So the court will not dismiss this case for lack of standing.

---

[5] The Common School Fund's Financial Statements are contained with the Board of Commissioners of Public Land's biennial reports, available at 2020-2021 Biennial Report.pdf, 2021-2023 Biennial Report.pdf, and Grzezinski Decl., Dkt. 81, Exhs. 6 and 7.

[6] https://www.irs.gov/applicable-federal-rates

**B.  Sovereign immunity**

The Eleventh Amendment generally prohibits individuals from suing a state, state agency, or state official in federal court. *Indiana Prot.* & *Advoc. Servs. v. Indiana Fam.* & *Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010). But in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized an exception to sovereign immunity for suits against a state official "when a plaintiff seeks prospective relief against an ongoing violation of federal law." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 520-21 (7th Cir. 2021).

In previous briefing, the Secretary did not dispute that the complaint alleged an ongoing violation of federal law, but he disputed that the relief sought by plaintiffs was properly characterized as prospective. *See* Dkt. 21, at 9; Dkt. 25, n.2. He now argues that the *Ex parte Young* exception is not available to plaintiffs because (1) they haven't proved an ongoing violation of federal law, and (2) a state official can't be sued *at all* in federal court—even for prospective declaratory or injunctive relief—for an alleged unconstitutional taking when the state courts remain open to adjudicate the claims. Dkt. 65, at 20. The Secretary says plaintiffs have two state court avenues available to them: (1) they can seek judicial review of any adverse decision concerning unclaimed property, as authorized by Wis. Stat. § 177.0906(1); or (2) they could assert a cause of action under the state-law equivalent of the takings clause, article 1, section 13 of the Wisconsin Constitution.

The Secretary arguably forfeited these new arguments by failing to raise them when he argued sovereign immunity at the dismissal stage. *See Meyers v. Oneida Tribe of Indians of Wisconsin*, 836 F.3d 818, 822 (7th Cir. 2016) (question of sovereign immunity is "not a jurisdictional one" and therefore is a waivable defense). But even if the arguments are not

forfeited, the court is not persuaded that plaintiffs' federal claim is barred by sovereign immunity.

The Secretary's first argument requires little discussion. In deciding whether suit lies under *Ex parte Young*, the court asks only whether the complaint *alleges* an ongoing violation of federal law, not whether the plaintiffs can prove it. *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002). Plaintiffs allege that the interest-payment provisions of Wisconsin's UPA violate the Fifth Amendment, and that the Secretary is committing an ongoing violation of the law by enforcing these provisions when the department settles claims. This is sufficient under *Ex parte Young*.

As for the Secretary's state-remedies argument, he relies primarily on quotes extracted from a handful of circuit court decisions and on the Supreme Court's recent decision in *DeVillier v. Texas*, 601 U.S. 285 (2024). The court is not persuaded that these authorities eliminate the *Ex parte Young* exception to sovereign immunity in Fifth Amendment claims against the state.

The court begins with the court of appeals cases. Only two, *Pavlock v. Holcomb*, 35 F.4th 581 (7th Cir.), *cert. denied*, 143 S. Ct. 374 (2022), and *Gerlach v. Rokita*, 95 F.4th 493 (7th Cir. 2024), are from the Seventh Circuit. In *Pavlock*, 35 F. 4th at 589, the court held that the plaintiffs could not proceed on their claims for equitable and declaratory relief because an injunction would not redress their injury, which stemmed from a ruling by the Indiana Supreme Court defining the boundary between private property and the public land of Lake Michigan. *Id*. at 589. The court ruled that the plaintiffs lacked standing because none of the named defendants, who were the Governor, the Attorney General, the Indiana Department of Natural Resources, and the State Land Office, "has the power to confer title on the Owners to land that

Indiana's highest court says belong to the state." *Id*. The court said nothing about state immunity or the availability of a state court remedy; to the contrary, it assumed without deciding that *Ex parte Young's* exception to sovereign immunity applied. *Id*. at 589.

*Gerlach* is likewise unhelpful to the Secretary. In that case, which involved a challenge to Indiana's revised UPA, the plaintiff was seeking "monetary relief for past Takings Clause violations from state-employee defendants in their official capacities," so the ordinary Eleventh Amendment bar against retrospective relief applied. 95 F.4th at 499. As for prospective, equitable relief, the court confirmed that "*Ex parte Young* permits a narrow set of claims against state officials 'when a plaintiff seeks prospective relief against an ongoing violation of federal law.'" *Id*. (quoting *Valcq*, 16 F.4th at 520–21). But the exception didn't help Gerlach, because she only sought retrospective relief. *Id*.

Neither *Pavlock* nor *Gerlach* holds that a state official can't be sued for prospective declaratory or injunctive relief for an alleged unconstitutional taking so long as the state provides an opportunity for the plaintiff to present her claim in state court. To the contrary, in both cases, the Seventh Circuit affirmed that even in a takings case, the *Ex parte Young* exception is viable.  The other circuit cases cited by the Secretary are to the same effect.[7]

---

[7] *James v. Hegar*, 86 F.4th 1076, 1083 (5th Cir. 2023) (factual allegations of complaint were too vague to demonstrate an ongoing violation under *Ex parte Young*), *cert. denied*, 144 S. Ct. 1461 (2024); *EEE Mins., LLC v. State of N. Dakota*, 81 F.4th 809 (8th Cir. 2023) (plaintiffs' claims for monetary relief were barred by sovereign immunity; *Ex parte Young* exception did not apply because plaintiffs' request for an injunction was simply a "reformulated" request for retrospective relief), *cert. denied sub nom. EEE Mins., LLC v. North Dakota*, 144 S. Ct. 1097 (2024); *74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 (2d Cir. 2023) (sovereign immunity barred plaintiffs' takings claims against the state "to the extent they sought monetary relief"; court explicitly recognized that an "exception exists [under *Ex parte Young*] for prospective relief against state officials in their official capacities"), *cert. denied*, 218 L. Ed. 2d 66 (Feb. 20, 2024); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 551 (4th Cir. 2014) (finding that plaintiffs' claim for an injunction to prevent the enforcement of a state law requiring state retirees who returned to

The Supreme Court's recent decision in *DeVillier*, 601 U.S. 285, doesn't change any of this. DeVillier was one of more than 100 property owners who filed an inverse-condemnation claim against Texas in state court, seeking compensation for flood damages that they contended were caused by the state's installation of a three-foot-high median barrier to prevent flooding of U.S. Interstate Highway 10. *Id*. at 288–90. The complaint included inverse-condemnation claims under both the Texas Constitution and the Takings Clause of the Fifth Amendment. Waiving its sovereign immunity, Texas removed the cases to federal court, where they were consolidated into a single proceeding. *Id*. at 290. Texas then moved to dismiss the federal inverse-condemnation claim, arguing that a plaintiff has no cause of action arising directly under the Takings Clause. *Id*. DeVillier took the position that the Takings Clause is "self-executing," which meant that the Clause itself provided a cause of action for just compensation, *i.e.*, damages. *Id*.

The district court agreed with DeVillier, but the Fifth Circuit reversed, siding with Texas. The Supreme Court granted certiorari to decide "whether a property owner may sue for just compensation directly under the Takings Clause[.]" *Id*. But after oral argument, the Court decided that it didn't need to answer that question because Texas had a state-law inverse-condemnation cause of action that provided a vehicle for the property owners' federal takings claims, and Texas agreed at oral argument that it would not oppose any attempt by plaintiffs to amend the complaint. *Id*. at 292.

---

work to contribute to state-created pension plans was prospective relief, but *Ex parte Young* exception was not available because the state officials named as defendants had no connection with the enforcement of the law); *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 956 (9th Cir. 2008) (recognizing that *Ex Parte Young* could apply to suit against state officials in their official capacities, but found that reverse condemnation action did not qualify as prospective relief).

Contrary to the Secretary's argument, Dkt. 91, *DeVillier* did not say that a property owner cannot assert a takings claim for equitable relief in federal court if there are procedures available to her in state court. The question in *DeVillier* (which the Court declined to answer) was whether a property owner could assert a federal takings claim for damages directly under the Fifth Amendment if § 1983 wasn't available. The case was not about forum. And in any event, *DeVillier* is distinguishable because plaintiffs in this case aren't suing the state for damages or compensation for past harm. They are suing for declaratory and injunctive relief for what they allege is an ongoing violation of federal law. Obviously, their case is *about* compensation, but that is not the relief they are seeking. And as discussed in this court's previous order, the mere fact that a victory in plaintiffs' favor would have consequences on Wisconsin's treasury is not enough to prelude them from proceeding under *Ex parte Young*. Dkt. 41, at 11.

Finally, the Secretary says that plaintiffs are barred from seeking even prospective, equitable relief under *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), in which the Court stated that "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Id.* at 1016. *See also Knick*, 588 U.S. at 202 ("Given the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate."); *Cerajeski*, 735 F.3d at 582 (noting that injunctive relief "may well be unavailable in this case") (citing *Ruckelshaus*). This argument is unpersuasive. Plaintiffs are not asking the court to stop the Secretary from taking the earnings on their property; to the extent they seek injunctive relief, it concerns the method by which the state will compensate them later, when plaintiffs reclaim their property, for having taken that interest. What is more,

plaintiffs are also seeking declaratory relief, which is a milder form of relief than "the strong medicine of the injunction." *Steffel v. Thompson*, 415 U.S. 452, 465 (1974). The Secretary does not cite any case from the Supreme Court or the Seventh Circuit holding that declaratory relief is unavailable so long as the state provides an adequate remedy for compensation, particularly where it's the very adequacy of that remedy that is at issue. And the district court cases cited by the Secretary holding otherwise are neither well-reasoned nor binding. *See Los Molinos Mut. Water Co. v. Ekdahl*, 695 F. Supp. 3d 1174, 1189 (E.D. Cal. 2023); *Culinary Studios, Inc. v. Newsom*, 517 F. Supp. 3d 1042, 1064–65 (E.D. Cal. 2021).

In sum, while there may be reasons for this court to deny plaintiffs injunctive or perhaps even declaratory relief on the merits of their federal takings claim, they are not foreclosed under the Eleventh Amendment from asking for that type of relief.

The court reaches a different conclusion on the state-law claim in count two. In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984), the Supreme Court held that the Eleventh Amendment bars any claim based on state law against a state or against a state officer, even one for prospective relief, subject to exceptions not applicable here. *See also Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020) ("Given the Eleventh Amendment and principles of sovereign immunity, however, a federal court cannot issue relief against a state under state law."). Plaintiffs offer no response to the Secretary's argument that the *Ex parte Young* exception is not available to them for their state-law claim. So the court will dismiss count two.

## C.  Merits

The court now turns to the merits. The Fifth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the taking of "private property . . . for public

use, without just compensation." U.S. Const. amend. V.  As noted above, plaintiffs contend that the carve-out for interest accruing before January 2, 2019, and the use of the federal long-term rate instead of the state's actual rate of return are unconstitutional because they fail to guarantee just compensation for the state's taking of the earnings on their property while in the state's possession. To prove their Takings Clause claim, plaintiffs must show that (1) the government "took" property, either through a physical taking or unduly onerous regulations, (2) the taking was for public use, and (3) the government did not (in this case, will not) pay them just compensation. *Conyers v. City of Chicago*, 10 F.4th 704, 710–11 (7th Cir. 2021).

### 1. Defendant's motion

The court begins with the Secretary's motion for summary judgment. The Secretary argues that he is entitled to summary judgment because (1) plaintiffs have no property right to *any* interest because their property consists of checks, insurance proceeds, and credit balances that conferred no right to interest when they were in the possession of the holders; (2) even if plaintiffs' property included a right to income or interest, that property right lapsed when plaintiffs abandoned it; and (3) even if plaintiffs have a property right in interest earned on their property, they aren't entitled to any compensation because they can't show a "net loss."

The Seventh Circuit has already rejected these arguments. As for the argument that plaintiffs have no property right to interest because their property was non-interest bearing before it was transferred to the state, the Seventh Circuit said otherwise in *Goldberg*, holding that "[t]he property's owner is entitled to 'income that the property earns' less custodial fees; what the property earns in the state's hands does not depend on what it had been earning in the owner's hands." 912 F.3d at 1011 (quoting *Kolton*, 869 F.3d at 533). The Secretary insists

20

that *Goldberg* is distinguishable because plaintiffs' property in this case consists of checks, insurance proceeds, and credit balances (what he calls "fixed debts") that conferred no right to interest when they were in the possession of the holders. Dkt. 65, at 50–52. But *Goldberg* explicitly addressed—and rejected—this argument. The court explained that "a check represents cash" which "has an option value—the option to invest or refrain from investing—that is lost if the state invests without the owner's consent. That loss has a compensable value." *Id*. at 1011; *see also id*. ("If the state turns the check into cash and makes an investment on the owner's behalf (and against the wishes of someone who did not want to invest), then it is vital to turn any gain over to the owner.").

The Seventh Circuit also rejected the Secretary's abandonment argument, which he rests on *Texaco, Inc. v. Short*, 454 U.S. 516 (1982). In *Texaco*, the Court held that Indiana had the power to enact a statute providing that a mineral lease that was not used for a period of 20 years would automatically lapse unless the mineral owner filed a statement of claim in the local county recorder's office, and that enactment of such a statute was not a governmental taking requiring just compensation. 454 U.S. at 528–30. The Secretary suggests that Wisconsin's UPA is similar to the statute in *Texaco* because it provides that property is deemed to be "presumed abandoned" after a certain period of time. *See* Wis. Stat. §§ 177.0201, 0208. But the Seventh Circuit dismissed this argument in *Cerajeski*, explaining that declaring property to be "presumed abandoned" "gives the state no authority to escheat property." 735 F.3d at 582–83. Unlike the mineral lease statute in *Texaco*, Indiana's UPA allowed the state to merely take custody, not unconditional title, of unclaimed property, until it had been unclaimed for 25 years. *Id*. at 581 (citing *United States v. Locke*, 471 U.S. 84, 100 (1985), and *Texaco*, 454 U.S. 51). Until then, held the court, "[if] the state takes either principal or interest it must render

just compensation to the owner if as in this case the owner's identity is known." *Id*. at 583. The Secretary hasn't identified any material differences between Wisconsin's UPA and Indiana's, so *Cerajeski* is controlling.

The Secretary's argument concerning "net loss" is also a dead letter. Focusing on the Supreme Court's statement in *Brown* that pecuniary compensation must be measured by the owner's "net losses rather than the value of the public's gain," 538 U.S. at 237, the Secretary argues that plaintiffs have suffered no "net loss" because their property was not earning interest before the holder transferred it to the state. Dkt. 64, at 59. Once again, this argument is foreclosed by *Goldberg*. The Seventh Circuit understood *Brown* to have held "that a state need not hand over earnings if the amount of the principal is so small that (in the Court's words) it 'cannot earn net interest'—in other words, when administrative expenses exceed the return on investment." 912 F.3d at 1011 (quoting *Brown*, 538 U.S. at 224). The court held that Indiana could use *Brown* to contend "that it does not owe interest on small amounts," adding that "[a]mounts as slight as $100 probably cannot earn net interest." *Id*. But it explicitly rejected as "untenable" the argument that the Secretary makes here, holding that "[t]he property's owner is entitled to 'income that the property earns' less custodial fees; what the property earns in the state's hands *does not depend on what it had been earning in the owner's hands*." *Id*. at 1011 (quoting *Kolton*, 869 F.3d at 533)(emphasis added). To the extent this sounds like "taker's gain" rather than "owner's loss," it's merely because there is no difference between the two, at least when the state invests someone's money without their consent. *Id*. (describing taker's "earnings on the invested cash" as the best substitute for owner's lost option value); *see also Brown*, 538 U.S. at 248 (value gained by the government by taking petitioner's interest and what petitioners lost was the same) (Scalia, J., dissenting).

22

Finally, in his response to plaintiffs' motion, the Secretary raises the additional argument that the interest earned by the state on plaintiffs' property constitutes "government-created value" for which it owes no compensation. Dkt. 82, at 10–11 (citing *United States v. Fuller*, 409 U.S. 488, 492 (1973); *United States v. Cors*, 337 U.S. 325, 333 (1949)). This argument requires little discussion. The Supreme Court has declined to apply the "government-created value" principle to interest earned on private property. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162 (1980) ("[T]he State's having mandated the accrual of interest does not mean the State or its designate is entitled to assume ownership of the interest."); *Phillips v. Washington Legal Found.*, 524 U.S. 156, 171 (1998) (relying on *Webb*'s to reject a similar "government-created value" argument with respect to Washington's IOLTA program.).

In sum, all of the Secretary's legal grounds for dismissal are foreclosed by controlling law. The Secretary's remaining arguments go to plaintiffs' ability to prove their claims. The court will address these in the context of deciding plaintiffs' motion.

### 2. Plaintiffs' motion

As noted, to prove their takings claim, plaintiffs must show that the government took their property for public use without paying just compensation. *Conyers*, 10 F.4th at 710–11. To establish the "takings" part of the claim, plaintiffs have produced undisputed evidence that (1) the Department of Revenue annually makes substantial transfers of unclaimed property funds to the Common School Fund, Dkt. 81-3; (2) the Common School Fund earns investment and interest income, Dkt. 81-1; and (3) the funds from these investment earnings go to public schools. *Id*.

The Secretary does not dispute how the UPA generally works or that the state earns interest on unclaimed property that it uses for public purposes. But the Secretary says that to

meet their burden, plaintiffs must identify a specific transaction showing a transfer of interest earned on their property to a public program. Dkt. 82, at 12–13.[8] The Secretary cites to *Brown*, where the Court noted that, although the record was not "crystal clear," each of the petitioners had identified a specific transaction in which interest on his escrow deposit was paid to the Foundation. *Brown*, 538 U.S. at 230.

The court concludes that plaintiffs can rely on how the UPA generally works to show that the government has taken their property for a public use, for two reasons. First, in *Brown*, the Court assumed without deciding that a taking had been shown, 538 U.S. at 235, so it's a stretch to infer that the Court intended to establish an evidentiary benchmark when it discussed specific transactions. Second, requiring plaintiffs in this case to make an individualized showing as to when (and how much) interest generated on their specific unclaimed property was used by the state is to demand the impossible. As noted previously, the Department of Revenue does not keep a separate account for each of the thousands of items of property in its custody, nor does it keep all the unclaimed property funds in one, self-contained account. Having received the benefit of plaintiffs' property, it would be unfair to permit Wisconsin to refuse to pay just compensation based on plaintiffs' failure to prove something that the state's own accounting system prevents. *Cf. Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) (employer cannot object that employee failed to prove damages for uncompensated work where employer failed to keep accurate records).

---

[8] The Secretary also argues that he is entitled to summary judgment on Vargo's claims because plaintiffs didn't submit any evidence about Vargo's property or argue why he would be entitled to compensation. Dkt. 82, at 8. This argument has no merit. Vargo is a member of the class, so he is entitled to the same relief as any other class member.

Turning to the compensation question, the court agrees with plaintiffs that the case is fairly simple. Under the Takings Clause, Wisconsin must allow plaintiffs "the benefit of the property's earnings, however large or small they turn out to be." *Kolton*, 869 F.3d at 533; *see also Goldberg*, 912 F.3d at 1011 ("The property's owner is entitled to 'income that the property earns' less custodial fees"). On its face, Wisconsin's UPA doesn't do this. The state doesn't allow the owner the benefit of any earnings on their property before January 2, 2019. And when it does pay interest, it does so at a rate not tied to any actual state earnings, but at a long-term federal rate that may be less than the state's return on the invested UPA funds.

The Secretary makes no attempt to reconcile these provisions with *Goldberg*. His central argument is that plaintiffs have no right to earn interest in the first place, so any interest that the state pays is a windfall. But as the court has explained, that is a losing argument in this circuit.

The Secretary's remaining argument is that plaintiffs aren't entitled to summary judgment because they haven't shown any net loss. The argument is that plaintiffs haven't shown that the state's gains on their property are greater than the Department of Revenue's expenses for administering the unclaimed property program. Dkt. 82, at 19. The court rejects this argument. Even accepting the Secretary's estimate that the state expends $20 for each property reclaimed, there are certainly numerous members in the class whose property generated earnings above that amount.[9] Vargo, for example, has unclaimed property in the

---

[9] Plaintiffs devote pages of their brief to contesting the propriety and amount of the Secretary's claimed administrative expenses. Dkt. 78, at 29–32. But the court isn't sure why any of this matters. The Seventh Circuit cases *permit* the state to charge a fee for its services, which it has described variously as "taking custody of unclaimed property and trying to locate the owner," *Cerajeski*, 735 F.3d at 579; a "bookkeeping fee," *Kolton*, 869 F.3d at 533; or "custodial fees," *Goldberg*, 912 F.3d at 1009. But neither side points to any statutory language authorizing the Secretary to actually deduct these fees when settling an allowed claim under the UPA. The

amount of $6,939. Even if the state's return on that amount was only one percent, his property would earn more than $20 in just one year. Similarly, even at a one percent simple interest rate, Buhk's $284 would have earned $51.12 in the 18 years that it has been in state custody.

In fact, the Secretary isn't really arguing that no property owner will ever suffer a net loss. The argument is that plaintiffs can't *prove* net loss until after they submit and establish their claim for the return of their property. But this is just a repackaging of the Secretary's argument that plaintiffs' claims are unripe, which this court has already rejected.

In sum, the Secretary has failed to offer any meritorious defense to plaintiffs' claim that the UPA's interest-payment provisions violate the Takings Clause by failing to guarantee the just compensation as established in *Goldberg*. So the court concludes that plaintiffs are entitled to summary judgment on count one of the third amended complaint.

## D. Relief

This leaves the question of relief. In their amended complaint, plaintiffs ask the court to issue four declarations and four injunctions, including a catch-all injunction ordering the Secretary to comply with any declaration that the court may order. Dkt. 46, at 14–15 (items b.–i.). But in their motion, plaintiffs ask for an order declaring that the Secretary, by enforcing the terms of the UPA, is violating the Fifth Amendment of the United States Constitution by failing to pay to unclaimed property owners "the full measure of just compensation, i.e., earnings, required by governing case law," along with a "corresponding injunction." Dkt. 68. And in their brief, they say they want an order declaring that the Secretary "must pay each

---

court sees no need to opine on the reasonableness of the Secretary's proposed $20/property charge unless he is actually charging it. If the parties believe this conclusion is in error or that administrative expenses need to be factored into any award of declaratory or injunctive relief, they should address it in their supplemental briefing, as ordered below.

Class Member the amount of the earnings on over $100 property while in custody, or the UPA-mandated rate(s) of interest on that property, whichever is greater." Dkt. 69, at 7.

Pressed by the Secretary to explain why they should be allowed to choose between the federal rate prescribed by the statute *or* the state's "earnings," plaintiffs reply that they aren't asking the court to declare the statutorily-prescribed amount unenforceable in all cases, but only when it denies them just compensation, that is, when the state's "actual earnings" are greater. The court understands plaintiffs to be conceding that it would not be unconstitutional for the state to repeal the language of § 177.0607(2) prescribing the federal long-term interest rate and replace it with language providing that the state will pay the interest that it actually earned on the property. In the meantime, or in the event the state opts to retain the provision, plaintiffs don't object to the state paying interest at the federal long-term rate, so long as it serves merely as a floor.

So understood, the court doesn't see a problem with plaintiffs' "whichever is greater" request in the abstract. The court cannot rewrite the statute, but it could, in theory, declare that class members are entitled to at least the state-earned interest on their property. The problem is that plaintiffs don't specify what they mean when they say they are entitled to the "state's earnings." The court presumes that plaintiffs are referring to the rate of return that the BCPL earns on the Common School Fund, but that's not entirely clear from their submissions. *See* Dkt. 87, at 5 (referring to "the amount of Common School Fund and SIF earnings"). Similarly, plaintiffs' complaint asks the court to declare the "proper measure of just compensation taking into account as appropriate the earnings, time value of money and value to the Defendant of the use of the property," Dkt. 46, at 15, but again, it's not clear what

plaintiffs believe the "proper measure" is. The court cannot determine whether declaratory relief is appropriate until plaintiffs state with precision what the declaration should say.

Plaintiffs' requests for injunctive relief suffer from the same vagueness problem. Apart from the lack of specificity as to how the state's earnings should be measured, plaintiffs haven't said whether they are still seeking an injunction requiring the state to hold interest earned on unclaimed property in a separate account, which is one of the requests itemized in the amended complaint. Dkt. 46, at 15, item h. And they have made no attempt to demonstrate that they satisfy the four criteria for a permanent injunction as set forth in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Accordingly, not later than November 29, 2024, plaintiffs must submit (1) a proposed declaration and injunction that precisely identifies the relief they are seeking, and (2) a brief in support.  The Secretary has until December 13, 2024, to respond to the plaintiffs' proposal. Plaintiffs have until December 20, 2024, to submit a reply.


ORDER

IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment on their federal takings clause claim, Dkt. 68, is GRANTED.

2. Defendant's motion for summary judgment, Dkt. 64, is GRANTED IN PART and DENIED IN PART. Summary judgment is GRANTED as to Count II of the Third Amended Complaint. The motion is denied in all other respects.

3. Not later than November 29, 2024, plaintiffs must submit a proposed declaration and injunction that precisely identifies the relief they are seeking, along with a

supporting brief. Defendant has until December 13, 2024, to respond to plaintiffs' proposal. Plaintiffs have until December 20, 2024, to reply.

Entered November 14, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge